IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 26, 2018

**STATE OF TENNESSEE v. JAMES ALLEN JENKINS**

**Appeal from the Criminal Court for Sullivan County**
**No. S63886   James F. Goodwin, Judge**

_____

**No. E2017-01983-CCA-R3-CD**
_____

The Defendant-Appellant, James Allen Jenkins, was convicted by a Sullivan County jury of aggravated robbery, aggravated assault, unlawful possession of a weapon, and theft of property $1,000 or less, for which he received an effective sentence of eleven years. See T.C.A. §§ 39-13-402, -102; 39-14-103; 39-17-1307(c)(1).   On appeal, the Defendant argues (1) the evidence was insufficient to support each of his convictions; (2) the trial court erred in allowing the State to cross-examine the Defendant regarding his prior convictions because the parties had previously entered a stipulation as to his status as a convicted felon; (3) the trial court erroneously permitted the testimony of a forensic expert regarding a Combined DNA Index System (CODIS) "hit" as inadmissible hearsay; and (4) whether his aggravated robbery and theft convictions violate principles of double jeopardy.[1]   Upon our review, we merge the Defendant's theft conviction and remand for entry of amended judgments reflecting merger of the theft conviction into the Defendant's aggravated robbery conviction.   In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Remanded for Entry of Amended Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined.  ROBERT H. MONTGOMERY, JR., J., filed an opinion concurring in part and dissenting in part.

Kenneth E. Hill, Kingsport, Tennessee, for the Defendant-Appellant, James Allen Jenkins.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Emily M. Smith and

_____

[1] We have re-ordered the Defendant's issues for clarity.

Teresa A. Nelson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On the evening of January 13, 2014, two Taco Bell employees were robbed at gunpoint and approximately $206 was taken from the cash register. The employees reported that the perpetrator discarded a cigarette butt during the robbery, upon which the Tennessee Bureau of Investigation (TBI) subsequently generated a complete Deoxyribonucleic Acid (DNA) profile. No suspect was immediately developed after the crime. However, the DNA profile from the cigarette butt resulted in a CODIS "hit" to the Defendant's DNA profile, which had been uploaded in CODIS from his prior convictions. After the TBI independently confirmed the hit, the Defendant was arrested for the instant offenses. Following the Defendant's arrest, one of the victims also identified the Defendant as the perpetrator of the offense. Based on these acts, on February 14, 2017, the Sullivan County Grand Jury indicted the Defendant for two counts of aggravated robbery, theft of property $1,000 or less, and convicted felon in possession of a firearm.[2] The following proof was adduced at trial.

The trial began by the reading of the parties' stipulation, exhibit 1, which provided (1) that the Defendant was a convicted felon, and (2) that the Defendant was convicted of a felony prior to the instant offense. Angela Worsham, an employee of Taco Bell, was working on the night of the offense when the Defendant entered the store.[3] She said he came in around 10:00 that evening, was wearing a dark "hoodie [that] was pulled up over [his] head," but his face could be seen clearly. Her attention was drawn to the Defendant because he was smoking, and Taco Bell is a non-smoking facility. She told Christopher Goldsberry, her manager, that he was smoking. When Goldsberry told him to put it out, the Defendant took it out of his mouth, put it on the ground, and smashed it with his foot. Goldsberry and Worsham looked at each other in "surprise" because the Defendant disposed of the cigarette inside the restaurant in that manner.

When Worsham and Goldsberry turned back towards the Defendant, he was pointing "an older gun like a revolver" at Goldsberry. Worsham explained that Goldsberry was standing behind the cash register, she was standing next to Goldsberry,

---

[2] The Defendant was initially indicted on August 26, 2014, for a single count of aggravated robbery, theft of property $500 or less, and convicted felon in possession of a firearm.

[3] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. and Mrs. or by his or her proper title.

and another employee, Zak Thornsberry, was in the back. She said the Defendant then demanded that Goldsberry give him the money from the cash register and "not to push any buttons." Goldsberry gave the Defendant approximately $206, and the Defendant left the restaurant. Goldsberry then called the Bristol Police Department. Once the police arrived, Worsham gave them a statement and showed them the Defendant's unmoved cigarette butt. Several photographs of the Taco Bell were admitted into evidence including a photograph showing a black smudge where the cigarette had been "mushed" into the recently mopped floor.

Worsham confirmed that the restaurant did not have surveillance cameras and that the Defendant did not speak to her. Although the Defendant never pointed the gun directly at Worsham, it was pointed in her direction. Worsham was certain that it was a "real gun" even though she could not distinguish the gun from "a replica or a toy gun." She did not recall the Defendant cocking the hammer of the gun or seeing the gun cylinder rotate. She confirmed that the Defendant pushed the door to exit, that he was not wearing gloves, and that she would have given the Defendant the money from the cash register had Goldsberry not done so.

Worsham identified the Defendant as the perpetrator of the offense at trial and at a preliminary hearing. Pressed on cross-examination regarding identification of the perpetrator, Worsham said,

> "[M]y eyes were trained on the man with the gun and I knew what he was doing and could see out of the corner of my eye what he was doing. I was in direct sight of the man."

On redirect examination, Worsham confirmed that she had been subpoenaed to court prior to trial to testify at a hearing in this case. Worsham said while she was sitting outside the courtroom with several other people present, she "knew exactly who it was when [the Defendant] walked in." On re-cross examination, pressed again regarding her identification at the preliminary hearing, Worsham testified that "I knew who he was before I even went into the courtroom. When a gun is pointed at you, that's a face you'll never forget."

Christopher Goldsberry testified consistently with Worsham's recollection of events. In addition, Goldsberry testified that he could not remember the perpetrator's face but described him as a "scruffy looking" white man in his forties, wearing a "dark hoodie" and work boots. He described the gun as "a revolver[,] an older style gun, maybe a 38[,] an old western type gun." Goldsberry explained that the perpetrator pointed the gun at him the entire time he opened the cash register and handed the perpetrator the money. Goldsberry was unable to identify the Defendant as the

- 3 -

perpetrator and explained that his "attention was [on] the gun and my life and my kids and wife." Goldsberry said he believed the gun was real but was unsure whether there were bullets in the gun and did not see the gun cylinder rotate or hear the perpetrator cock the gun.

Lieutenant Justin Branson of the Bristol Police Department testified that he responded to the Taco Bell robbery and obtained statements from Worsham and Goldsberry. He said Goldsberry directed him to the Defendant's cigarette butt located on the floor in front of the cash register. Lieutenant Branson collected the cigarette butt as evidence, sealed it in an envelope, placed his initials on the envelope, and gave it to Sergeant Jason McCreedy. He identified the ash mark in one of the photographs where the cigarette was put out and confirmed that he used gloves to collect the cigarette butt. On cross-examination, Lieutenant Branson explained that none of the previously admitted photographs were of the cigarette butt as it was found because "it's a small item in a store with a lot of things going on and [he] didn't want to get it contaminated, damaged, somebody step on it so that's why [he] collected it at that point just to preserve the actual cigarette butt." He further testified that he found a footprint outside the restaurant, that he or another officer photographed the footprint, and agreed that it looked more like a tennis shoe than a work boot. He also confirmed that there was no paperwork to document that he gave the cigarette butt to Sergeant McCreedy.

Sergeant Jason McCreedy of the Bristol Police Department testified that he responded to the Taco Bell robbery and retrieved the cigarette butt sealed in an initialed envelope from Lieutenant Branson. He then secured it in his police vehicle, processed the rest of the scene, and put the evidence into the evidence locker at the police station. Sergeant McCreedy testified that he photographed the scene, dusted for fingerprints on the door the Defendant entered and exited, and obtained written statements from the victims at the police station. He said there was no identification match made from the fingerprints on the restaurant door. He sent the cigarette butt to the TBI for DNA analysis. He later received a phone call from TBI Agent Turbyville, who confirmed a "possible match" to the name James Jenkins. In following up on this information, Sergeant McCreedy located the Defendant at the Edgemont Towers Apartments where the Defendant was living with his wife, Barbara Orr. Sergeant McCreedy explained that the Edgemont Towers Apartments were located "approximately 1.4 miles driving distance" from the Taco Bell. He drove the distance in 3 minutes and 54 seconds.

The Defendant came to the police station and voluntarily provided a DNA sample via buccal swab. Sergeant McCreedy sent the Defendant's DNA sample to the TBI and the analysis positively matched the DNA on the cigarette butt. Sergeant McCreedy also reviewed surveillance camera video and access card information from the Edgemont Towers Apartments. Sergeant McCreedy went to the Defendant's apartment twice. The

first time he went there to speak to the Defendant and did not conduct a search. The second time, the day of the Defendant's arrest, Barbara Orr provided consent for the officers to search her apartment and her car, and no gun was found. The second search occurred "almost four months" after the instant crimes. During Sergeant McCreedy's testimony, a photograph of the Defendant as he looked in 2014, was admitted into evidence.

TBI Special Agent Charly Castelbuon, an expert in serology and DNA analysis, testified that she analyzed the cigarette butt and generated a complete DNA profile. She completed her report on February 19, 2014, at which point there was no known suspect for the instant offense, and confirmed that only the DNA of one male was found on the cigarette butt. She further testified that CODIS is a DNA database that is maintained by both federal and state law enforcement agencies. She said it contains many DNA profiles from forensic case work, missing persons, and TBI laboratory staff profiles. It allows TBI agents to "run a known profile against [it] to see if there is a match between any of those profiles." Asked if convicted felons profiles are contained in CODIS, she replied, "Yes, it should be." She acknowledged that CODIS "testing" was conducted on the DNA profile generated from the cigarette butt; however, it was performed by another agent. There was no objection as to her testimony pertaining to CODIS.

TBI Special Agent Michael Turbyville, an expert in serology and DNA analysis, testified that he analyzed Agent Castelbuon's report and complete DNA profile. Agent Turbyville testified that he tested "a known reference standard from the subject." When asked if Agent Castelbuon's complete DNA profile was run through CODIS, defense counsel objected and was overruled by the trial court following brief discussion. Agent Turbyville defined the CODIS database, consistently with the testimony of Agent Castelbuon. The State then asked if there was a "CODIS match" regarding the DNA profile generated from the cigarette butt, and Agent Turbyville replied, "Yes, the cigarette DNA profile that she obtained from the cigarette butt hit in the CODIS database." Asked to then name the individual who was "the match" for the DNA profile after it was ran through CODIS, Agent Turbyville replied, "James Allen Jenkins." Based on the CODIS "hit," Agent Turbyville requested and subsequently received a known DNA sample from the Defendant. Agent Turbyville specifically received the Defendant's DNA sample via buccal (by mouth) swab, from the Bristol Police Department. He then analyzed the swab for DNA and generated a complete DNA profile for the Defendant. He compared the DNA profile from the Defendant to the DNA profile generated from the cigarette butt, and confirmed that "it was a match." Upon subjecting the match to a population statistics program, Agent Turbyville determined that the probability of the DNA on the cigarette butt belonging to someone other than the Defendant exceeded one in the world population or "once in every 1.3 quintillion individuals."

Agent Turbyville memorialized his conclusions in multiple reports, all of which were admitted into evidence without objection except for exhibit 16. As to exhibit 16, the report showing the CODIS hit, defense counsel renewed his objection, generally.[4] The report specifically stated that the DNA profile generated from the cigarette butt "was searched against the CODIS database and a possible match was detected. The information being provided is an investigative lead only. In order to confirm this, a blood or buccal sample from [the Defendant's name and date of birth] must be submitted for DNA testing."

Jeffrey Scythers, a seventeen-year veteran with the Bristol Tennessee Housing Authority, managed several apartment complexes, including Edgemont Towers Apartments. He authenticated video surveillance from the apartments from the night of the offense which was played for the jury. He also authenticated access card information previously given to the police and explained that an access card, issued only to residents, is required to enter the apartments. The video showed a male individual, later identified as the Defendant, entering the apartments with Barbara Orr's access card at 10:05 p.m. and entering the first floor lobby and elevator at 10:07 p.m. The video later showed the Defendant re-entering the apartments with Barbara Orr's access card and taking the elevator to the seventh floor at 10:25 p.m. Neither the videos nor the access card report for that night showed Orr's card being used to exit the apartments.

Officer Preston Bowers of the Bristol Police Department testified that he was assigned to support the Bristol Housing Authority and had become familiar with the residents of Edgemont Towers Apartments over his eight-year tenure. Prior to the offense, he knew Barbara Orr and had seen her "in the presence of the Defendant in public spaces." Officer Bowers pulled the video surveillance from the apartments from the night of the offense and provided it to the police. He viewed the apartment surveillance video prior to and at trial, and on both occasions identified the male individual as the Defendant. Officer Bowers was present when the Defendant was arrested for the instant offenses at Orr's apartment. On cross-examination, Officer Bowers said that he was also familiar with Lonnie Lingerfelt, a man whom Bower's had previously seen "around the apartments."

The Defendant, age 50 at the time of trial, testified that he was a lifelong resident of Bluff City, Tennessee. He had been employed at the same company for over 30 years, installing and refinishing hardwood floors. At the time of the offense, the Defendant lived in "Hickory Tree" but would "sometimes . . . stay at [his] wife's apartment in

---

[4] As we will discuss more fully below, it is unclear whether the grounds in support of this objection were based on counsel's standing objection to reference to CODIS as discussed in his pre-trial motion to dismiss or on the newly asserted basis of hearsay.

Edgemont Towers." He confirmed that she stayed on the seventh floor in apartment 7E. Asked about the two residences, he explained that they "didn't like the city." The Defendant and his wife had frequent visitors to the apartment, including his cousin, Lonnie Lingerfelt. The Defendant testified that Lingerfelt looked "just like him except he has tattoos on his biceps, is a bit heavier, maybe a little taller." The Defendant explained that he was working the night of the instant crimes and was living in between his home on Hickory Tree Road and his wife, Barbara Orr's apartment at Edgemont Towers.

The Defendant identified himself in the surveillance video as the man wearing a "Tennessee hat." He then identified two still photographs taken from surveillance video on April 6, 2014, exhibits 21 and 22, and identified the man as his cousin, Lonnie Shawn Lingerfelt. The Defendant said Lingerfelt occasionally visited the apartment and that the Defendant's wife would let Lingerfelt use one of her access cards to enter the apartment building. He confirmed that Lingerfelt smoked cigarettes and "sometimes he'd take cigarettes out of the ashtray[.]" The Defendant was unsure whether he went on Volunteer Parkway that night but explained that "[i]f [he] did the only place [he] could have went was across the Parkway to [his] uncle Johnny's" which was approximately five to ten minutes walking distance from the Edgemont Towers Apartments. Asked whether Lingerfelt was at the apartment on the night of the crimes, the Defendant replied, "Yeah, I think he was."

On cross-examination, the Defendant testified that he was unsure whether he was married to Barbara Orr in January 2014 and could not remember their wedding date, but thought "[i]t might have been 2015." He confirmed that he did not have an access card to Orr's apartment and that he often borrowed her access card when he stayed there. On the night of the robbery, the Defendant confirmed that he was wearing a "dark colored hoodie" but said he was wearing dark colored loafers, not boots. He confirmed that he smoked at the time of the offense and when asked whether he was testifying that Lingerfelt took his cigarette and dropped it at the Taco Bell, the Defendant said:

> No, ma'am, he could have. He could have or it could have got there anytime during that day. Me and my wife used to ---- I used to take my wife to that nail place right beside there and she'd go in and get her nails fixed and I'd go in Taco Bell and get me something to eat.

The Defendant did not recall telling Sergeant McCreedy in his statement that he "ha[d]n't been to that Taco Bell in years" and said that was untrue. He confirmed that he was convicted of seven counts of statutory rape on July 8, 2009.

After deliberation, the jury found the Defendant guilty of aggravated robbery (count one), the lesser included offense of aggravated assault (count two), theft $1,000 or

less (count three), and convicted felon in possession of a firearm (count four). On July 28, 2017, the trial court sentenced the Defendant to eleven years for the aggravated robbery, nine years for the aggravated assault, three years for the convicted felon in possession of a firearm, and eleven months and twenty-nine days for the theft of property $1,000 or less. These sentences were ordered to be served concurrently, for an effective sentence of eleven years. The Defendant filed a motion for new trial on August 4, 2017, which was denied by the trial court. It is from these judgments that the Defendant appeals.

## ANALYSIS

**I. Sufficiency of the Evidence.** In challenging the evidence supporting his convictions, the Defendant argues that the State failed to carry its burden of proving the Defendant's identity, that the gun was never pointed at Angela Worsham and she could not have reasonably feared imminent bodily injury, and that neither victim could verify that he possessed a real gun. The Defendant does not dispute the remaining elements of his convictions. The State responds that victim testimony and DNA evidence established the Defendant's identity, that both victims reasonably feared imminent bodily injury by the Defendant's gun, and that victim testimony verified that the Defendant used a gun to commit the instant crimes. Upon review, we agree with the State.

In resolving this issue, we apply the following well-established standard of review. The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d. 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court,

accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

When the State offers proof of guilt based on circumstantial evidence, the jury decides how much weight to give to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (internal quotation and citation omitted). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)).

A. Identification. The Defendant argues that the evidence is insufficient to support his aggravated robbery and theft $1,000 or less convictions because the State failed to prove his identity as the perpetrator beyond a reasonable doubt. Specifically, the Defendant argues that Christopher Goldsberry could not identify the Defendant and that, although Angela Worsham was "unwavering with regard to identification of the [Defendant] as the robber[,]" she testified that "she took her eyes off of the robbery" several times. The State responds, and we agree, that the Defendant's identity was sufficiently established by Angela Worsham's eyewitness identification and DNA evidence connecting the Defendant to the scene.

Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when the robbery is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" T.C.A. §§ 39-13-401(a), -402(a)(1). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a).

"The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn.

1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing Strickland, 885 S.W.2d at 87.) Additionally, "[i]n the resolution of questions of fact, such as those presented by evidence of alibi or the identity of the perpetrator, 'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" State v. Pope, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting State v. Hornsby, 858 S.W.2d 892, 297 (Tenn. 1993)); see also Cole v. State, 215 S.W.2d 824, 825 (Tenn. 1948); Smith v. State, 566 S.W.2d 553, 556 (Tenn. Crim. App. 1978).

Here, the Defendant asserts that the State failed to prove his identity as the perpetrator beyond a reasonable doubt. Viewed in the light most favorable to the State, the record shows that the Defendant entered Taco Bell, discarded his cigarette on the restaurant floor, pulled a gun on the two victims, and demanded the money from the cash register. Angela Worsham positively identified the Defendant as the perpetrator before and during trial, and DNA from the discarded cigarette butt at the scene matched the Defendant's DNA. No other DNA was found on the cigarette butt. The Defendant is not entitled to relief on this issue.

B. Reasonable Fear of Imminent Bodily Injury. The Defendant next argues that the evidence is insufficient to support his aggravated assault conviction because one of the victims, Angela Worsham, could not have reasonably feared imminent bodily injury as the gun was not pointed directly at her. The State responds that Angela Worsham was in the immediate vicinity of the Defendant and his gun, that she would have complied with the Defendant's demands had Christopher Goldsberry not done so, and that the "Defendant's use of a gun frightened her."

A person commits aggravated assault when the person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury" when the assault "[i]nvolved the use or display of a deadly weapon[.]" T.C.A. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii). A deadly weapon is defined as either "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or [] anything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" T.C.A. § 39-11-106(a)(5). An object that is not necessarily deadly per se may nonetheless be deadly "if the defendant in a particular case

actually used or intended to use the item to cause death or serious bodily injury." State v. McGouey, 229 S.W.3d 668, 673 (Tenn. 2007) (emphasis omitted).

Here, Angela Worsham testified that she was standing next to Christopher Goldsberry while the Defendant pointed his gun at Goldsberry. She further testified that, had Christopher Goldsberry not complied with the Defendant's demands for money, she would have intervened and complied. Although she admitted the gun was not directly pointed at her, Worsham said she feared for her life and was scared to move. This issue likewise does not avail the Defendant relief.

C. Unlawful Possession of a Weapon. The Defendant finally argues that the evidence is insufficient to support his unlawful possession of a weapon conviction because the State failed to prove beyond a reasonable doubt that the perpetrator possessed a real gun. The State responds that both victims testified that they believed that the Defendant was using "a functional handgun."

In order to sustain the Defendant's conviction for unlawful possession of a weapon, the State was required to prove that the Defendant unlawfully "possesse[d] a handgun . . . and has been convicted of a felony[.]" T.C.A. § 39-17-1307(c)(1). The State and defense counsel stipulated before trial that the Defendant was a convicted felon; the Defendant does not now dispute that he had prior felony convictions. Here, the Defendant only challenges the authenticity of the gun. Viewed in the light most favorable to the State, we conclude that the evidence was sufficient to support the Defendant's conviction. Both victims testified that they believed the gun that the Defendant used in the commission of the instant crimes was real and the jury was able to determine their credibility at trial. We conclude that a rational juror could have found that the Defendant was in possession of a gun during the instant crimes. Accordingly, the Defendant is not entitled to relief.

**II. Admissibility of Defendant's Prior Convictions.** Next, the Defendant argues that the trial court erred in permitting the State to cross-examine him regarding his previous felony convictions because the parties had stipulated to his status as a convicted felon. In addition, the Defendant asserts, for the first time on appeal, that the trial court failed to weigh the probative value against the prejudicial effect of the convictions in violation of Tennessee Rule of Evidence 404(b). The State argues, and we agree without further discussion, that the Defendant waived his 404(b) challenge by failing to "object to the introduction of prior convictions on Rule 404(b) grounds at trial." See Tenn. R. App. P. 36(a); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) ("A party may not raise an issue for the first time in the appellate court."). The State does not address the Defendant's remaining ground for relief. For the reasons that follow, we

conclude that the trial court properly admitted the Defendant's prior convictions under Rule 609 of the Tennessee Rules of Evidence.

The crux of the Defendant's argument is that the State should have been precluded from cross-examining him regarding his prior convictions because he had already stipulated to his status as a convicted felon. In support of his claim, the Defendant relies upon State v. James, 81 S.W.3d 751, 762 (Tenn. 2002) and State v. Timothy Bryant Burton, No. M2010-02177-CCA-R3-CD, 2011 WL 6147017 (Tenn. Crim. App. Dec. 7, 2011). In James, the defendant was charged with felony escape, which required the State to prove, as an element of the offense, that he was incarcerated for a felony at the time of his escape. At trial, the defendant offered to stipulate that he had been incarcerated for a felony at the time of the escape in order to prevent the jury from learning of the specific felonies of which he had been convicted. The State did not agree to this stipulation and, during its case-in-chief, the deputy warden testified and established each of the defendant's felony convictions. In reversing the defendant's convictions, our supreme court found the substantive rationale in Old Chief v. United States, 519 U.S. 172 (1997), persuasive and concluded that, because of the defendant's offered stipulation that he was incarcerated for a felony at the time of his escape, the State could not present proof as to his specific felony convictions:

> [W]e hold that when the sole purpose of introducing evidence of a defendant's prior convictions is to prove the status element of the offense, and when the defendant offers to stipulate his status as a felon, the probative value of the evidence is, as a matter of law, outweighed by the risk of unfair prejudice. Therefore, in this limited instance, the trial court should have accepted the defendant's stipulation in lieu of disclosing the names or nature of his previous convictions, as the latter evidence had little probative value and was likely to provoke the jury's prejudice.

James, 81 S.W.3d at 762 (footnote omitted).

In Burton, the defendant was charged with a violation of the sex offender registry for failure to timely register with a law enforcement agency within forty-eight hours of his change of residence. Following his conviction, the defendant appealed, citing State v. James, 81 S.W.3d 751 (Tenn. 2002) and State v. Robert J. Wrigglesworth, Jr., No. M2005-01841-CCA-R9-CO, 2006 WL 2069430 (Tenn. Crim. App. July 26, 2006), for the proposition that the trial court erred in allowing the State to introduce specific evidence of his prior convictions to establish his status as a violent sex offender in violation of due process and the rules of evidence. In denying relief, this court distinguished James and reasoned as follows:

- 12 -

[A] defendant can offer to stipulate to the elements of an offense, but by doing so cannot prevent the jury from learning of an element of the offense or the stipulation. In other words, when evidence of a defendant's prior conviction is necessary to prove the status element of an offense, as in the case sub judice, the defendant may offer to stipulate his status as a felon. James, 81 S.W.3d at 762. If the defendant does so stipulate, disclosure of the names or nature of the prior convictions has "little probative value and [is] likely to provoke the jury's prejudice." Id. In the absence of a stipulation, however, the "probative value of an essential element of the offense would almost always outweigh any potential prejudice under Rule 404(b) [of the Tennessee Rules of Evidence], [and therefore the] specific nature of the offense w[ould] be admissible." State v. Wingard, 891 S.W.2d 628, 634 (Tenn. Crim. App. 1994) (overruled on other grounds James, 81 S.W.3d at 763 n. 7).

Timothy Bryant Burton, 2011 WL 6147017, at *5.

In our view, the Defendant's reliance on James and Burton is misplaced. In both of those cases, the objection was to the admissibility of the Defendant's prior convictions as substantive evidence and for the purpose of establishing the status element of the offense in the State's case-in-chief. These cases were therefore governed by Rules 401, 403, and/or 404(b) of the Tennessee Rules of Evidence. Unlike in James, the record here shows that the State accepted the Defendant's stipulation as to his convicted felon status, which was offered as substantive proof of the status element of the offense during its case-in-chief. Our analysis reveals the Defendant's true grievance is that his stipulation did not insulate him from impeachment during his testimony. Neither James nor Burton avail the Defendant relief in this regard.

A defendant charged with being a felon in possession of a firearm can generally prevent the prosecution from referring to the specific name or nature of his prior felony by stipulating to his status as noted in the above authority. However, this protection may yield if the defendant chooses to testify. See Old Chief, 519 U.S. at 176 n. 2 (observing that "[w]hile it is true that prior-offense evidence may in a proper case be admissible for impeachment, even if for no other purpose, Fed. Rule Evid. 609, the defendant did not testify at trial."); see also State v. Herron, 461 S.W.3d 890, 906 (Tenn. 2015) (noting that "Rule 609 'is an exception to the general principle in [Tennessee] Rule [of Evidence] 404(a) that character evidence is inadmissible,' and this exception 'is based on the precept that it is appropriate for the trier of fact to look at a witness's character by considering some of the witness's criminal convictions' for the purpose of assessing the witness's credibility.") (internal citation omitted). When a defendant elects to testify, as in the case at bar, he may be cross-examined about the predicate felony for the limited

- 13 -

purpose of impeaching his testimony subject to Rule 609 of the Tennessee Rules of Evidence. See United States v. Kemp, 546 F.3d 759 (6th Cir. 2008) (holding that protection afforded by Old Chief "can recede when a criminal defendant chooses to testify at trial"); United States v. Collier, 527 F.3d 695 (8th Cir. 2008) (admitting evidence of prior conviction for credit card fraud under Rule 609(a)(2)); United States v. Crawford, 130 F.3d 1321 (8th Cir. 1997) (noting that Old Chief does not apply where prior felonies were admitted to impeach credibility); see also State v. Gayles, 756 S.E.2d 46, 50-51 (2014) (holding that defendant was subject to impeachment on basis of prior convictions, even though he had stipulated to being a convicted felon for purposes of the firearm charge).

With the above law in mind, we conclude that the trial court properly determined that the Defendant's prior convictions of statutory rape were admissible for purposes of impeachment should the Defendant choose to testify. Prior to trial, the State provided the Defendant with notice of its intent to use the Defendant's criminal history for impeachment purposes. After the State rested its case-in-chief and on the heels of the Defendant's motion for judgment of acquittal, defense counsel asked for a ruling concerning the interplay between the State's notice of its intent to seek enhanced punishment based on the Defendant's seven prior convictions of statutory rape and the stipulation as to the Defendant's status as a convicted felon. Defense counsel argued, inter alia, that the stipulation "bar[red] the questioning of whether [the Defendant] was convicted of these offenses. The jury is aware that he has a prior felony." In response, the State argued that it was seeking to admit the Defendant's prior conviction only if the Defendant chose to testify as impeachment. Moreover, the State contended, and the trial court ultimately agreed, that there was a distinction between "why we entered into the written stipulation for purposes of that count in the indictment versus the [D]efendant making a decision, informed decision to testify subject to impeachment."

Although the trial court did not explicitly engage in a formal Rule 609 analysis, it conducted a hearing outside the presence of the jury and determined that the Defendant's seven convictions for statutory rape from 2009 were admissible should he choose to testify. Upon our de novo review, see State v. Lankford, 298 S.W.3d 176, 181 (Tenn. Crim. App. 2008), we find the probative value of the Defendant's convictions on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. While the probative value of a statutory rape conviction on the issue of credibility is minimal at best, it is sufficiently distinct from the charged offense to lessen any potential prejudicial effect. Moreover, the Defendant testified and denied being involved in the offense. He suggested instead that his cousin was the perpetrator, because his cousin looked like him and occasionally took cigarette butts from his ashtray in his wife's apartment. The Defendant placed his credibility squarely at issue. Accordingly, we conclude that the

- 14 -

trial court did not err in admitting the Defendant's prior statutory rape convictions for impeachment purposes, and the Defendant is not entitled to relief.

**III. Admission of Expert Testimony.** The Defendant next argues that the testimonies of Special Agents Castelbuon and Turbyville, specifically the DNA match result from the CODIS database, constituted hearsay and should not have been allowed at trial. The Defendant asserts that the State failed to introduce "the return report or any other documentary proof" supporting the DNA results. The State responds that the trial court properly allowed expert testimony regarding the CODIS DNA match because the match, even if hearsay, was not offered for the truth of the matter asserted but instead for the effect on the listener. The State explained that this testimony was not used to prove the Defendant's DNA on the cigarette butt but instead to show "how law enforcement ultimately came to collect a DNA sample from [the] Defendant." Based on the below authority and analysis, we conclude that the testimony pertaining to the CODIS "hit" was inadmissible hearsay; however, any error in its admission was harmless.

Prior to trial, the Defendant filed a motion to dismiss based on the erroneous admission of his DNA profile into the CODIS database. Because his statutory rape convictions should have been destroyed by the TBI after dismissal of certain counts of his convictions, the Defendant essentially argued that his DNA profile should not have been uploaded into CODIS and any subsequent reliance on that profile was "fruit of the poisonous tree." The trial court conducted a full evidentiary hearing, entertained argument of counsel, and denied the motion. Additionally, in the preliminary matters on the first day of trial, after the parties discussed the stipulation to the Defendant's prior felony conviction of statutory rape, the State mentioned "one other thing that is related to the stipulation . . . there was a CODIS hit that came back to law enforcement where the defendant was identified because his name had been put in the system because of that prior. Is there any objection to us discussing that in the proof since it is already stipulated to? We wouldn't of course go into what that line of conviction was." The trial court advised the State to instruct/caution the witness not to get into the details of the conviction, and defense counsel objected, standing on his prior motion to dismiss. The trial court again overruled the Defendant's motion/objection.

The following exchange occurred at trial after TBI Agent Michael Turbyville was asked to briefly explain the CODIS database:

> Defense Counsel: I think CODIS is hearsay if he's going to start testifying to what he's seen in the database. I think its hearsay. He's not the one that could introduce it and I think that's where we're going with it, right?
>
> . . . .

- 15 -

Defense Counsel: He's going to testify he had a hit on CODIS I'm assuming and I think that's hearsay.

State: Well, I mean he can rely on that as part of his, of what he did and how he came to complete what he did. Now, I think he can testify - - -

The Court: It would be an exception - - - to show why he did what he did.

Agent Turbyville then testified and defined CODIS generally as a collection of DNA profiles from eight different databases including arrestee, convicted offender, forensic unknown relative to missing persons, etcetera. Agent Turbyville said CODIS is used to store DNA evidence when law enforcement may not have a subject to match the evidence against. He testified that the evidence from the instant case, i.e. the DNA profile from the cigarette butt generated by Agent Castelbuon, was uploaded in CODIS and "hit" on the name James Allen Jenkins. He sent that information to the Bristol Police Department, and they later obtained a known DNA sample from the Defendant. Agent Turbyville compared the known DNA sample of the Defendant to the DNA profile from the cigarette butt and determined they matched.

In resolving this issue, we are mindful that "the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "[h]earsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. In Kendrick, the Tennessee Supreme Court determined that the standard of review for hearsay statements involves multiple layers:

Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and

- 16 -

credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. State v. Gilley, 297 S.W.3d at 759-61. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review. State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Kendrick v. State, 454 S.W.3d 450, 479-80 (Tenn. 2015). However, declarations are non-hearsay when they are used to prove the effect on a listener: "[A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair are not hearsay . . . because [the statement] is not used to prove the truth of the matter asserted in the statement." Neil P. Cohen, et al., Tennessee Law of Evidence, § 8.01, at 8-23 (5th ed. 2005); see also State v. Venable, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (holding that a statement introduced for its effect on the listener is not hearsay).

As an initial matter, to the extent that the Defendant attempts to incorporate the grounds supporting his motion to dismiss, a close review of the record shows that he has waived consideration of whether his DNA was erroneously uploaded into CODIS.[5] At issue here is the testimony from TBI Agent Turbyville that there was a CODIS "hit" linking the DNA from the cigarette butt recovered from the crime scene to the Defendant's name and date of birth. Here, we are inclined to agree with the Defendant that Agent Turbyville's testimony concerning the CODIS hit was in fact hearsay. There was no testimony at trial as to who generated the Defendant's DNA profile that was uploaded into CODIS, who uploaded the Defendant's DNA into CODIS, how CODIS maintained this information, or any records concerning the use or operation of CODIS. Although the State argues it was admitted for the effect on the listener, rather than the truth of the matter asserted, there is no question that the testimony was probative of the Defendant's identity, a crucial element of the offense.

Because this is an issue of first impression in Tennessee, we find it helpful to consider case authority on the admissibility of testimony from other, similar law enforcement databanks for guidance. Tennessee has frequently allowed experts to testify

[5] The Defendant's brief on this issue is limited to an assertion of hearsay. It does not contend, nor do we consider, whether the admission of this testimony was admitted in violation of the Confrontation Clause of the United States Constitution or the Tennessee Constitution, both of which guarantee a criminal defendant the right to confront witnesses against him or her. See U.S. Const. amend. VI; Tenn. Const., art. I, § 9.

- 17 -

regarding their leads obtained through fingerprint cards previously uploaded into the Automated Fingerprint Identification System (AFIS). See e.g., State v. Jerrie Coleman, No. W2015-01925-CCA-R3-CD, 2016 WL 7687124, at *4 (Tenn. Crim. App. June 15, 2016); State v. Marlow Williams, No. W2005-02803-CCA-R3-CD, 2007 WL 2781720, at *8 (Tenn. Crim. App. Sept. 25, 2007), perm. app. denied (Tenn. Apr. 7, 2008) (noting that an expert may base an opinion upon inadmissible hearsay, if the type of hearsay is one that would be reasonably relied upon by experts in that situation). Admissibility of AFIS based testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Because AFIS is a database that stores known fingerprint profiles which are relied upon by experts in the field in developing their investigation, we view them similarly to the DNA profiles stored in CODIS. Although the record shows that Agent Turbyville was qualified as an expert prior to his testimony concerning the CODIS "hit," to the extent that the CODIS hit was admitted in this case without the procedural safeguards of Rules 702 and 703, any testimony concerning a "match" to the Defendant's identity was error and should have been excluded.

We must now determine the effect of the error on the Defendant's case. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Here, the Defendant does not contend, nor does the record reflect, that the admission of the testimony concerning the CODIS hit was prejudicial. Significantly, the Defendant did not question at trial or on appeal the veracity of his CODIS DNA profile. In other words, he did not challenge whether the DNA profile in CODIS triggering the "hit" was in fact his. Moreover, the TBI Agent engaged in an examination, independent of the CODIS hit, to confirm the substantive evidence linking the Defendant to the crime. He confirmed the CODIS hit by comparing the DNA profile from the cigarette butt generated by an agent who testified at trial to the DNA profile that was voluntarily provided by the Defendant. Any prior reference to a DNA match or hit was therefore cumulative. Accordingly, we conclude that the erroneous admission of the CODIS hit was harmless. The Defendant is not entitled to relief.

**IV. Double Jeopardy/Merger of Convictions.** The Defendant argues, and the State concedes, that his convictions for aggravated robbery and theft should have been merged as they "arose from the same event and the same evidence was relied upon by the State[.]" For the reasons that follow, we merge the Defendant's conviction of theft and remand this matter for entry of amended judgments to reflect merger of his theft convictions into the greater offense of aggravated robbery.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be subject for the same offen[s]e to be

- 18 -

twice put in jeopardy of life or limb[.]" The Tennessee Constitution also protects against double jeopardy convictions, providing that "no person shall, for the same offen[s]e, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Three fundamental principles underlie double jeopardy: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012) (citations omitted).

"Where commission of one crime necessarily involves commission of the second, the offense so involved is said to be merged in the offense of which it is a part . . . [T]he doctrine of merger does not apply where the offenses are separate and distinct, but only where the identical criminal acts constitute both offenses." 21 Am. Jur. 2d Criminal Law § 21 (1998) (internal citations omitted); State v. Berry, 503 S.W.3d 360, 362 (Tenn. 2015) ("Merger is required when a jury returns verdicts of guilt on two offenses and one of the guilty verdicts is a lesser-included offense of the other offense."). "It is uncontested that theft is a lesser-included offense of robbery." State v. Bowles, 52 S.W.3d 69, 79 (Tenn. 2001). The Tennessee Supreme Court has stated that "when two jury verdicts are merged into a single conviction, the trial court should complete a uniform judgment document for each count." Berry, 503 S.W.3d at 364. This rule ensures that there is a complete record of each conviction and sentence in the event that one of the convictions is later reversed. Moreover, this rule "reflects the long-held recognition that the guilty verdict in the lesser or alternative charge is not mere surplusage but remains a valid jury verdict of guilt that need not be 'dismiss[ed],['] 'vacat[ed],' 'or stri[cken].'" Id. (quoting State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. Nov. 20, 1997)); see also State v. Soller, No. E2008-02420-CCA-R3-CD, 2010 WL 2301748, at *13 (Tenn. Crim. App. June 9, 2010) (indicating that the merged offense is not "extinguished").

Here, the jury convicted the Defendant of aggravated robbery of Christopher Goldsberry (count one) and the offense of theft $1,000 or less (count three). Because the offense of theft is wholly incorporated into the offense of aggravated robbery, the offenses are the "same" under Blockburger and violate principles of double jeopardy. See State v. Hayes, 7 S.W.3d 52, 56 (Tenn. Crim. App. 1999). Accordingly, upon remand, the judgment of conviction for theft should be merged into a single conviction for aggravated robbery and amended judgments should be entered showing the merger. The trial court should also note in the "Special Conditions" box on counts one and three that the conviction in count three merged with the conviction in count one. See id. at 364.

## CONCLUSION

Based on the foregoing reasoning and analysis, we conclude that the evidence is sufficient to support the Defendant's convictions, that the trial court did not err in permitting the State to cross-examine the Defendant regarding his prior felony convictions for impeachment purposes, and that the erroneous admission of testimony concerning the CODIS hit was harmless. We further conclude that the Defendant's conviction for theft should be merged into his conviction for aggravated robbery. Accordingly, we remand this case to the trial court for entry of amended judgments to reflect the merger of these convictions. In all other respects, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE